**No. 25-40161**

# In the
# United States Court of Appeals
# for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

v.

ANTHONY JAMES MADRID,

*Defendant-Appellant*

On Appeal from the United States District Court
for the Eastern District of Texas
No. 1:21-CV-507

## Brief of Appellant

T. Peyton Smith
Damonta D. Morgan
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201
peyton.smith@formanwatkins.com
damonta.morgan@formanwatkins.com


*Counsel for Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Appellee: | Counsel for Appellees: |
|---|---|
| United States of America | Russell James of U.S. Attorney's Office Beaumont, TX |
| United States of America | Bradley Visosky of U.S. Attorney's Office Plano, TX |

| Appellant: | Counsel for Appellants: |
|---|---|
| Anthony Madrid | T. Peyton Smith of Forman Watkins & Krutz, LLP Jackson, MS |
| Anthony Madrid | Damonta D. Morgan of Forman Watkins & Krutz, LLP Jackson, MS |

Respectfully submitted,

Anthony James Madrid

*/s/ Peyton Smith*
T. Peyton Smith, *His Attorney*

i

## STATEMENT REGARDING ORAL ARGUMENT

This case presents a question of first impression for the Fifth Circuit: whether 18 U.S.C. § 924(c)(1)(A), which imposes a mandatory additional sentence for using or carrying a firearm during and in relation to a drug trafficking offense, has a Founding-era analogue as mandated by *N.Y. State Rifle & Pistol Ass'n* v. *Bruen*, 597 U.S. 1 (2022). We contend that it does not as applied to the circumstances presented in this case. Oral argument may assist the Court in understanding why.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................i

STATEMENT REGARDING ORAL ARGUMENT .................................ii

TABLE OF CONTENTS ............................................................... iii

TABLE OF AUTHORITIES.............................................................iv

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE ............................................................1

SUMMARY OF THE ARGUMENT ......................................................5

STANDARD OF REVIEW.................................................................7

ARGUMENT ...............................................................................8

  I.  Mr. Madrid's Second Amendment argument can be heard on initial collateral review..............................................................8

  II. 18 U.S.C. § 924(c)(1)(A) violates the Second Amendment as applied to Mr. Madrid.......................................................11

CONCLUSION ..........................................................................25

CERTIFICATE OF SERVICE...........................................................27

CERTIFICATE OF COMPLIANCE.....................................................28

# TABLE OF AUTHORITIES

**Cases**

*Bousley* v. *United States*, 523 U.S. 614 (1998)..............................................7

*Caetano* v. *Massachusetts,* 577 U.S. 411 (2016).....................................13

*District of Columbia* v. *Heller*, 554 U.S. 570 (2008) ........................ *passim*

*Griffith* v. *Kentucky*, 479 U.S. 314 (1987) .................................................8

*McDonald* v. *Chicago*, 561 U.S. 742 (2010) ...............................................4

*Montgomery* v. *Louisiana*, 577 U.S. 190 (2016)...................................6, 7

*New York State Rifle & Pistol Association, Inc.* v. *Bruen*, 597 U.S. 1 (2022) .......................................................................................... *passim*

*Schriro* v. *Summerlin,* 542 U.S. 348 (2004)................................................6

*Slack* v. *McDaniel*, 529 U.S. 473 (2000).....................................................4

*Stimmel* v. *Sessions*, 879 F.3d 198 (6th Cir. 2018) ..................................13

*Teague* v. *Lane*, 489 U.S. 288 (1989)..................................................5, 6, 9

*United States* v. *Daniels*, 124 F.4th 967 (5th Cir. 2025) .........................14

*United States* v. *Diaz*, 116 F.4th 458 (5th Cir. 2024) ..........................8, 13

*United States* v. *Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) .........12

*United States* v. *Madrid*, 852 F. App'x 864 (5th Cir. 2021)......................2

*United States* v. *Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015)............13

*United States* v. *Rahimi*, 602 U.S. 680 (2024) .............................8, 16, 17

*United States* v. *Rahimi,* 61 F.4th 443 (5th Cir. 2023) ............................8

*United States* v. *Ramos-Rodriguez,* 136 F.3d 465 (5th Cir. 1998) .........10

*United States* v. *Valas*, 40 F.4th 253 (5th Cir. 2022)...............................6

*United States* v. *Verdugo-Urquidez*, 494 U.S. 259 (1990) ......................12

*Welch* v. *United States*, 578 U.S. 120 (2016)...........................................6, 7

**Statutes**

18 U.S.C § 924(c)(1)(A) ................................................................ *passim*

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 922(g)(1).............................................................................1

18 U.S.C. § 924(c) ...................................................................... 1, 12, 17

18 U.S.C. § 924(c)(2)..............................................................................9

21 U.S.C. § 841(a)(1)..............................................................................1

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 2255 ......................................................................... 2, 3, 7

ACTS AND LAWS, MADE AND PASSED BY THE GENERAL COURT OR ASSEMBLY OF THE GOVERNOR AND COMPANY OF THE STATE OF CONNECTICUT, HOLDEN AT NEW-HAVEN, ON THE SECOND THURSDAY OF OCTOBER, ANNO DOM. 1783 633 (Timothy Green 1783).................................................16

CHARTER OF THE CITY OF ALBANY 37 (1800) ...........................................15

La. Rev. Stat. § 14:64.3 (2024) .................................................................17

LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS AND RESOLVES, ROYAL COMMISSIONS AND INSTRUCTIONS 564 (1771)...........15

LAWS OF THE STATE OF NEW YORK 83–84 (1785) .....................................15

LAWS OF THE STATE OF NEW YORK: PASSED AT THE SESSIONS OF THE LEGISLATURE HELD IN THE YEARS 1777-1801, BEING THE FIRST TWENTY-FOUR SESSIONS 353 (1886) .................................................................14

LAWS OF THE TERRITORY OF THE UNITED STATES NORTH-WEST OF THE RIVER OHIO, FROM THE COMMENCEMENT OF THE GOVERNMENT TO THE 31ST OF DECEMBER, 1791 19–21 (Childs & Swaine 1792).............16, 17

v

Miss. Code Ann. § 97-3-79 (2024)..........................................................17

ORDINANCES OF THE CORPORATION OF THE CITY OF BALTIMORE 283–84
     (1801) ................................................................................................15

ORDINANCES OF THE CORPORATION OF THE DISTRICT OF SOUTHWARK 49–50
     (1829) ................................................................................................15

STATUTES OF THE STATE OF VERMONT, PASSED BY THE LEGISLATURE IN
     FEBRUARY AND MARCH 1787 68–69 (George Hough & Alden Spooner
     1787)..................................................................................................16

Texas Penal Code § 29.03 (1994) .........................................................17

## Other Authorities

John Levin, *The Right to Bear Arms: The Development of the American
     Experience*, 48 CHI.-KENT L. REV. 148, 150 (1971)...............................15

Lynn Marsella, S*omething about Carry: Supreme Court Broadens the
     Scope of 18 U.S.C. 924(C)*, 89 J. CRIM. L. & CRIMINOLOGY 973, 974
     (1999) ................................................................................................12

## Treatises

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE
     INTERPRETATION OF LEGAL TEXTS § 24, at 167–68 (2012 ....................10

T. Barlow, THE JUSTICE OF THE PEACE: A TREATISE 11 (1745)................14

## Constitutional Provisions

U.S. Const. amend. II..........................................................................10

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Mr. Madrid filed a timely notice of appeal on April 7, 2025. *See* ROA.154–56.

## STATEMENT OF THE ISSUES

ISSUE NO. 1:   Whether Mr. Madrid's Second Amendment challenge to 18 U.S.C § 922(c)(1)(A) can be heard on collateral review.

ISSUE NO. 2:   Whether 18 U.S.C § 924(c)(1)(A) was unconstitutional as applied to Mr. Madrid's circumstances.

## STATEMENT OF THE CASE

On February 6, 2019, Appellant Anthony James Madrid was indicted on one count of possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); one count of "brandishing a firearm, during and in relation to, a crime of violence," in violation of 18 U.S.C. § 924(c); and one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). ROA.182–83. Mr. Madrid pleaded "not guilty" on each count. A few weeks later, the Government upgraded Mr. Madrid's § 924(c) charge to "discharging a

1

firearm, during and in relation to, a drug trafficking crime," in its First Superseding Indictment. ROA.196–97. That upgrade was not inconsequential: under the statute, "brandishing" carries a mandatory minimum sentence of seven years, while "discharging" carries a mandatory ten. *See* 18 U.S.C. 924(c)(1)(a)(ii)–(iii).

Mr. Madrid ultimately pleaded guilty to Counts One and Two (possession with intent to distribute cocaine and discharging a firearm during and in relation to a drug trafficking crime) of the First Superseding indictment, and the Government dismissed Count Three. *See* ROA.227. In explaining the factual basis for its charges, the Government contended that in January 2019, Mr. Madrid was in his home when he saw multiple people get out of a car wearing ski masks. *See* ROA.230. The Government suggested that these individuals were drug traffickers who were present to collect on a debt for cocaine that was located in Mr. Madrid's house. *Id.* They alleged that Mr. Madrid fired several rounds at the drug traffickers who were attempting to break into his home. *Id.* As all defendants seeking a guilty plea must, Mr. Madrid consented to the Government's recitation of the facts.

The court accepted Mr. Madrid's guilty plea, *see* ROA.240, and

sentenced him to 87 months' imprisonment, 5 years supervised release, and a $100 special assessment on Count One, and, consecutively, to 120 months' imprisonment, 5 years supervised release, and a $100 special assessment on Count Two, *see* ROA.287.

After an unsuccessful direct appeal, *see United States* v. *Madrid*, 852 F. App'x 864 (5th Cir. 2021), Mr. Madrid moved in the district court to set aside his sentence for involuntariness and ineffective assistance of counsel under 28 U.S.C. § 2255, *see* ROA.16–28. While the district court was reviewing his § 2255 motion, the Supreme Court decided *New York State Rifle & Pistol Association, Inc.* v. *Bruen*, 597 U.S. 1 (2022). There, the Supreme Court held that when the Second Amendment's plain text covers an individual's conduct, the government bears the burden of showing that its regulation is consistent with the Nation's historical tradition of firearm regulation. In so holding, the Court rejected the means-end scrutiny approach that the courts of appeal had developed and affirmed that modern gun restrictions are unconstitutional unless supported by a well-established analogue from the Founding era. Mr. Madrid thus supplemented his § 2255 motion to argue that the § 924(c) charge was unconstitutional as applied to him. *See* ROA.58–60.

3

The Magistrate Judge denied Mr. Madrid's motion on each count. She held that (1) Mr. Madrid had voluntarily waived his right to appeal his conviction when he signed the plea agreement; (2) Mr. Madrid "failed to show deficient performance on the part of counsel," and (3) Mr. Madrid could not show that the plain text of the Second Amendment covers his conduct because that Amendment only protects the right to bear arms for a lawful purpose. See ROA. 69–84. The district court affirmed the Magistrate Judge's findings and declined to issue a Certificate of Appealability. *See* ROA.137–39.

Mr. Madrid subsequently applied to this Court for a Certificate of Appealability on the denial of his § 2255 motion and the constitutionality of § 924(c) as applied to him. *See* ECF 20 at 4. Attached to his Application was a "Sworn Declaration of Anthony James Madrid." *Id*. at 22–23. In the Declaration, Mr. Madrid recounts that, on the day of his arrest, he was at his rental home with his common-law wife and children. *Id*. at 22. As he was waking up his son, he saw "several black masked individuals with guns that readily appeared to be coming to kick-in the front door." *Id*. Mr. Madrid retrieved his weapon and eventually fired it, causing the masked intruders to leave. *Id*. at 23. "[I]t was only my

4

intention[] to protect my family," Mr. Madrid swore in the Declaration. *Id*. at 25.

This Court denied Mr. Madrid's application as to the appeal of his § 2255 motion but granted it as to his Second Amendment claim, finding that Mr. Madrid had demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See* ECF 21 at 2 (citing *Slack* v. *McDaniel*, 529 U.S. 473, 484 (2000)). The Court also instructed the parties to "address the cognizability of Mr. Madrid's challenge on initial collateral review." *Id*. at 2. Mr. Madrid submits this brief in response to both questions presented.

## SUMMARY OF THE ARGUMENT

In *Bruen*, the Supreme Court clarified the proper method for analyzing restrictions on the right to keep and bear arms. *See* 597 U.S. 1 (2022). Building on *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), and *McDonald* v. *Chicago*, 561 U.S. 742 (2010), *Bruen* reaffirmed that the Second and Fourteenth Amendments secure an individual right to possess and carry firearms for self-defense, and it decisively rejected the "two-step" framework developed by the courts of appeals that blended

historical inquiry with means-end scrutiny. In its place, *Bruen* established a single text-and-history standard: when the Second Amendment's plain text covers an individual's conduct, that conduct is presumptively protected, and the Government bears the burden of demonstrating that its restriction is consistent with the Nation's historical tradition of firearm regulation.

Under this framework, the analysis begins and ends with the text and the historical record. The Second Amendment protects the right of "the people" to keep and bear arms—a phrase the *Heller* Court has defined as encompassing all members of the national community, not a narrow or privileged subset. *Heller*, 554 U.S. at 580. Once an individual's conduct falls within the Amendment's text, the government must identify a Founding-era analogue demonstrating that the challenged law accords with historical understandings of permissible regulation. Importantly, the Court explained, the analogue must share the same "how and why." *Bruen*, 597 U.S. at 29.

The Government cannot make that showing here. There is no Founding-era tradition of criminalizing or enhancing punishment solely for the act of carrying or discharging a firearm while engaged in a

6

trafficking offense, as 18 U.S.C. § 924(c)(1)(A)(iii) does. And there is certainly no analogue applying such a penalty for acts committed in one's own home, as was the case here. At the Founding, the possession of arms was considered a personal right—and, in many contexts, a civic duty. Because the Government cannot identify any historical analogue supporting statutes that criminalize conduct the Founders regarded as lawful, it fails to justify these modern restrictions under *Bruen*'s text-and-history test.

That this argument comes up for the first time on initial collateral review does not change the outcome. *Bruen* worked a substantive change in Second Amendment law, and the Supreme Court's precedent recognize that such substantive changes are cognizable on collateral review. *See Teague* v. *Lane*, 489 U.S. 288 (1989). Accordingly, this Court can and should reach the merits of Mr. Madrid's Second Amendment challenge, and should hold that § 924(c)(1)(A)(iii) is unconstitutional under the Second Amendment's original meaning and must be voided as applied to Mr. Madrid.

## STANDARD OF REVIEW

On appeal from the denial of a 28 U.S.C. § 2255 motion, this Court

reviews *de novo* the district court's legal determinations and its factual findings for clear error. *United States* v. *Valas*, 40 F.4th 253, 257 (5th Cir. 2022).

## ARGUMENT

## I.   MR. MADRID'S SECOND AMENDMENT ARGUMENT CAN BE HEARD ON INITIAL COLLATERAL REVIEW.

In *Teague* v. *Lane*, 489 U.S. 288 (1989), the Supreme Court "continued a long tradition of giving retroactive effect to constitutional rights that go beyond procedural guarantees." *Montgomery* v. *Louisiana*, 577 U.S. 190, 202 (2016). Under *Teague*, courts must give retroactive effect to new substantive rules of constitutional law. *Id.* at 200. Procedural rules, by contrast, "generally do not apply retroactively." *Schriro* v. *Summerlin*, 542 U.S. 348, 352 (2004).

A procedural rule "regulate[s] only the manner of determining the defendant's culpability." *Welch* v. *United States*, 578 U.S. 120, 129 (2016) (quoting *Schriro*, 542 U.S. at 353). Such rules affect "the range of permissible methods a court might use to determine" a defendant's guilt or punishment, including rules allocating decision making authority between judge and jury or regulating what evidence the court may consider. *Id.* (quoting *Schriro*, 542 U.S. at 353). Finality is respected for

8

procedural rules because, even if an error occurred, the conviction or sentence may still be lawful. *Montgomery*, 577 U.S. at 202.

Substantive rules, by contrast, "alter the range of conduct or the class of persons that the law punishes." *Welch*, 578 U.S. at 132 (quoting *Schriro*, 542 U.S. at 353). This includes decisions that place particular conduct or persons beyond the State's power to punish or that narrow the scope of a criminal statute. *Id.* at 1265. Substantive rules carry a significant risk that a defendant stands convicted of conduct that the law does not make criminal. *Id.* at 1266 (quoting *Bousley* v. *United States*, 523 U.S. 614, 620 (1998)).

*Bruen* announced such a substantive rule. It established that the Second Amendment protects individual conduct unless the Government demonstrates a historical analogue justifying regulation. 597 U.S. at 29. By requiring a text-and-history inquiry, *Bruen* overruled prior precedent that applied means-end scrutiny or deferred broadly to legislative judgments regarding firearm regulation. See *id.* at 18–19. At the time of Mr. Madrid's plea and sentence, courts routinely upheld restrictions such as § 924(c)(1)(a) without this historical inquiry. *Ibid.*

Because *Bruen* fundamentally altered the scope of the law—the

9

class of conduct the State may punish—it is a substantive rule and, under *Teague* and *Welch,* applies retroactively. The rule does not merely change procedures for determining guilt or punishment; it identifies conduct—possession or use of a firearm in certain circumstances—that the State may not lawfully criminalize absent historical justification. *See* 597 U.S. at 18, 24. Indeed, this Court has already held that *Bruen* constitutes a significant change in the law, "rendering [its] prior precedent obsolete." *United States* v. *Diaz*, 116 F.4th 458, 465 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025) (citing *United States* v. *Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023), *rev'd*, 602 U.S. 680 (2024)).

Retroactive application is further mandated by the Supreme Court's categorical approach in *Griffith* v. *Kentucky*, 479 U.S. 314, 328 (1987), which held that new rules must apply to *all* cases pending on direct review to ensure uniformity and prevent inequitable treatment. *Teague* extended this reasoning to collateral review, emphasizing that similarly situated defendants cannot be treated differently based on the timing of their convictions. 489 U.S. at 303–16. Congress recognized this principle in AEDPA, too, authorizing successive petitions where the claim relies on "a new rule of constitutional law, made retroactive to cases

on collateral review by the Supreme Court." 28 U.S.C. §§ 2244(b)(2)(A), 2255(h)(2).

Accordingly, *Bruen*'s holding must apply retroactively to Mr. Madrid's § 924(c)(1)(a)(iii) conviction. Any contrary conclusion would violate the categorical approach to retroactivity, the principle of equal treatment for similarly situated defendants, and the Second Amendment itself, which protects the conduct criminalized in this case.

## II.   18 U.S.C. § 924(c) VIOLATES THE SECOND AMENDMENT AS APPLIED TO MR. MADRID.

In *Bruen*, the Supreme Court articulated a clear framework for analyzing Second Amendment challenges: courts must first ask whether the text of the Second Amendment covers the conduct at issue. 597 U.S. at 24. If it does, the Constitution presumptively protects that conduct, and the burden shifts to the Government to demonstrate that the challenged regulation is consistent with the Nation's historical tradition of firearm regulation. *Id.* *Bruen* clarified that the Government may not rely on generalized interests such as public safety or crime prevention to justify a regulation; rather, it must demonstrate a "well-established and representative" historical tradition that is *relevantly similar* in both purpose and burden. *Id.* at 30. Where no such tradition exists, the

statute must fall.

Here, 18 U.S.C. §924(c)(1)(A) imposes severe, mandatory consecutive sentences for discharging a firearm during the commission of a drug-trafficking crime or a "crime of violence." As written and enforced, that provision sweeps broadly and places a substantial burden on core Second Amendment conduct. "Crime of violence" and "drug trafficking crime" are broad categories under the federal Code. The statute defines "crime of violence" as any offense with "the use, attempted use, or threatened use of physical force against the person or property of another" as an element. 18 U.S.C. §924(c)(3). Similarly, "drug trafficking crime" encompasses "any felony punishable under the Controlled Substances Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46." 18 U.S.C. § 924(c)(2). By design, the statute empowers the Government to punish the possession, carry, use, or discharge of a firearm in any scenario that prosecutors can force into one of § 924(c)'s broad predicate categories.[1] Undoubtedly then, sometimes,

---

[1] In practice, the Government is not even required to score a conviction or plea on the predicate "crime of violence" or "drug trafficking crime" before § 924(c)'s Second Amendment-depriving penalties attach. This Court has long held that it is the "fact of the offense, and not a conviction, that is needed to establish the required predicate" under § 924(c). *United States* v. *Ramos-Rodriguez*, 136 F.3d 465, 467 (5th Cir. 1998).

the statute will reach constitutionally protected conduct like that at issue here.

The Founders never envisioned such a robust restriction of the Second Amendment, and the Government cannot point to any historical precedent suggesting otherwise. While colonial and early-republic authorities sometimes regulated public discharge of firearms and punished the use of weapons in the commission of crime, none of these historical measures imposed independent, across-the-board, mandatory penalties separate from the underlying offense. And, even more importantly, none of the regulated or penalized firearm conduct was of the kind that occurred within one's home. Accordingly, as applied here, §924(c)(1)(A)(iii) cannot be reconciled with the Second Amendment under *Bruen*.

## A. The text of the Second Amendment covers Mr. Madrid's conduct.

Under *Bruen*, Mr. Madrid is only required to show that the text of the Second Amendment covers his conduct. He easily satisfies that requirement.

The Second Amendment declares: "A well regulated Militia, being

13

necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court explained in *Heller*, the Amendment's operative clause protects three distinct elements: the right (1) of "the people," (2) to "keep and bear," (3) "arms." 554 U.S. at 579–95 (2008). Mr. Madrid and his conduct fall squarely within each.

*First*, as an American citizen and lifelong member of the national community, Mr. Madrid is among "the people" protected by the Second Amendment. *Heller* held that "the people" in the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Id*. at 580. In reaching that conclusion, the Court reasoned that "the people" has the same meaning across the Bill of Rights—as used in the First, Fourth, Ninth, and Tenth Amendments. *See id*. at 579–81 (citing *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The *Heller* Court also emphasized the textual contrast between "the militia" in the Amendment's prefatory clause and "the people" in the operative clause. At the Founding, "the militia" referred to a limited subset of able-bodied males, whereas "the people" encompassed the whole citizenry. *Id*. at 580–81. Reading these terms in

14

context, as standard interpretive principles require, confirms that "the people" in the Second Amendment extends broadly to all Americans. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24, at 167–68 (2012).

Consistent with that understanding, courts have recognized that the term "the people" is not limited to law-abiding citizens. *See, e.g., United States* v. *Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (even "dangerous felons" are "indisputably part of 'the people'" for Second Amendment purposes); *Stimmel* v. *Sessions*, 879 F.3d 198, 204–05 (6th Cir. 2018) (*Heller*'s "law-abiding" language does not "demarcate [the Second Amendment's] outer limit"; all "members of the political community" are entitled to claim the Amendment's protections, not simply law-abiding, responsible citizens); *United States* v. *Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015) (the Second Amendment "is not limited to such on-again, off-again protections" depending on criminal status). This Court has reasoned similarly. *See Diaz*, 116 F.4th 458 at 465. Under *Bruen*'s plain-text inquiry, Mr. Madrid is plainly part of "the people" protected by the Amendment.

*Second*, the rights to "keep" and "bear" arms encompass Mr.

Madrid's conduct. *Heller* held conclusively that "arms" include weapons "in common use at the time," 554 U.S. at 624–25, and that the right to keep such arms in one's home qualifies as "core" Second Amendment conduct, *see* 554 U.S. at 630.[2]    The Court reaffirmed *Heller*'s central holding six years later in *Caetano* v. *Massachusetts,* 577 U.S. 411, 411–12 (2016) (holding that Massachusetts' stun gun ban violated the Second Amendment because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding"), and again in *Bruen* six years after that, *see* 597 U.S. at 70 ("[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms").

In this case, Mr. Madrid was penalized for bearing (1) a common use firearm (2) in his home.  And he fired that arm "in defense of hearth and home."  *Heller*, 554 U.S. at 635.  That is the very scenario *Heller* deemed constitutionally protected.  Thus, at least since *Heller*, the Second Amendment's plain text has covered—and protected—the conduct Mr. Madrid was penalized for in this case.  Mr. Madrid has

---

[2] Importantly, the right to "bear" arms necessarily presupposes the ability to fire it when confronted.  *See Jackson* v. *City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("Without bullets, the right to bear arms would be meaningless.").

16

therefore satisfied Step One of *Bruen*'s test, and the burden shifts to the Government to identify a historical analogue justifying its robust restriction of the Second Amendment right.

### B. The Government cannot establish a historical tradition justifying §924(c)(1)(A).

18 U.S.C. § 924(c) was first adopted as part of the Gun Control Act of 1968. *See* Lynn Marsella, S*omething about Carry: Supreme Court Broadens the Scope of 18 U.S.C. 924(C)*, 89 J. Crim. L. & Criminology 973, 974 (1999). At that time, it applied only to felonies and did not reach drug crimes. *Id.* "In 1984, Congress amended the statute by enlarging its scope from 'any felony' to 'any crime of violence.'" *Id.* Two years later, Congress added drug crimes. *Id* at 975. Today, § 924(c) is almost unrecognizable from its first edition. It imposes a categorical, evidence-triggered enhancement that (a) adds a new, substantial mandatory minimum penalty; (b) applies across multiple predicate categories; and (c) sweeps in conduct protected by the Second Amendment.

Section 924(c) was not enacted until *almost two centuries after the Nation's founding*. Its drafters likely would not have anticipated the expansive way the law is applied today. More importantly, the Framers could not have envisioned such a broad-based deprivation of the Second

Amendment. And the history makes that clear.

At the founding, Anglo-American practice punished weaponized wrongdoing, but it did so principally in one of three ways: (1) by attempting to prevent weaponized crime on the front end (affray/surety laws); (2) by imposing local ordinances forbidding discharging firearms in public; or (3) by making the use of a weapon an element of an aggravated substantive offense (*e.g.*, armed robbery or assault with a deadly weapon). None of these modalities created a separate statutory device that, in addition to the offense's own punishment, automatically tacked on a distinct, mandatory, consecutive term of years solely for the "brandishing" or "use" of a firearm during any qualifying felony, let alone a drug-trafficking offense. That structural point is dispositive under *Bruen*: the modal difference between "firearm as element" of a crime and "stand-alone federal enhancement" is central to how the regulatory burden functioned historically. As a result, none of these laws can be said to "share a common 'why' and 'how'" with § 924(c). *United States* v. *Daniels*, 124 F.4th 967, 973 (5th Cir. 2025).

*1. Surety and Affray Laws*

The Supreme Court discussed the historical role of surety and

18

affray laws at length in *Bruen* and *Rahimi*. Surety laws were a form of bond; they were preventative in nature and required people "of whom there is a probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance . . . that such offence . . . shall not happen." *Rahimi*, 602 U.S. at 695. They "also targeted the misuse of firearms." *Id.* at 696. Often, surety laws allowed justices of the peace to "'arrest' all who 'go armed offensively [and] require of the offender to find sureties for his keeping the peace.'" *Id.* (citing *Bruen*, 597 U.S., at 56, and n. 23). But before the surety was levied, the would-be wrongdoer was entitled to some semblance of due process. *Id.* at 696–97.

Affray laws were slightly different. They "punished those who [] menaced others with firearms." *Rahimi*, 602 U.S. at 697 (internal quotations omitted). Often, they prohibited the offense of going armed "with dangerous and unusual weapons" "to the Terror of the People." *Id.* (citing T. Barlow, THE JUSTICE OF THE PEACE: A TREATISE 11 (1745)); *see also* 2 LAWS OF THE STATE OF NEW YORK: PASSED AT THE SESSIONS OF THE LEGISLATURE HELD IN THE YEARS 1777-1801, BEING THE FIRST TWENTY-FOUR SESSIONS 353 (1886). Violations of the affray laws could result in "forfeiture of the arms . . . and imprisonment." *Id.* at 697.

19

These laws are weak analogues for § 924(c). First, they were aimed at public peace rather than establishing a generalized, cross-Code enhancement for firearms used during any felony. More importantly, they were aimed at menacing *public* bearing rather than penalizing *the tool* used in the commission of a distinct offense. Under *Bruen* and *Rahimi*, analogues must share the same *how* and *why*—not merely the general notion that arms could be regulated to protect public safety. The surety and affray laws fail on this score. *See Diaz*, 116 F.4th at 464 (discussing *Rahimi*'s "why and how" analysis).

*2. State & Local Ordinances on Public Discharge*

Colonial and early state legislatures often restricted the manner in which arms could be used, typically prohibiting the discharge of firearms in towns or near houses, barns, or livestock to protect public safety. *See* John Levin, *The Right to Bear Arms: The Development of the American Experience*, 48 CHI.-KENT L. REV. 148, 150 (1971). For example, in 1628, Massachusetts forbade shooting near or into dwellings or gardens. *Id.* In early 18th-century Pennsylvania, the Legislature prohibited firing a gun within Philadelphia without a Governor-issued license. *Id.* Similar laws persisted through the Revolutionary era: New Hampshire (1771),

Pennsylvania (1774), and New York (1785) restricted firing arms on and around Christmas and New Year's, imposing fines or forfeiture as punishment. *See* 3 LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS AND RESOLVES, ROYAL COMMISSIONS AND INSTRUCTIONS 564 (1771)*;* ORDINANCES OF THE CORPORATION OF THE DISTRICT OF SOUTHWARK 49–50 (1829); LAWS OF THE STATE OF NEW YORK 83–84 (1785). By the turn of the nineteenth century, Baltimore, Maryland and Albany, New York had prohibited firing weapons in public altogether. *See* ORDINANCES OF THE CORPORATION OF THE CITY OF BALTIMORE 283–84 (1801); CHARTER OF THE CITY OF ALBANY 37 (1800).

These laws addressed public nuisances and safety hazards that existed *outside the home*. None of them purported to ban or penalize the firing of arms inside the home for self-defense (as was the case here), and none of them imposed a mandatory, consecutive enhancement across disparate offenses. These laws are too distinct to qualify as analogues for purposes of the *Bruen* analysis.

*3. Weapon as an Aggravator*

Early state legislatures sometimes aggravated penalties for offenses when the offense was committed with a weapon. For example,

21

Connecticut (1783), Vermont (1787), and Ohio (1788) all had laws that distinguished simple robbery (defined as "unlawfully and forceably tak[ing] from the person of another") from armed robbery (defined as "robbery with personal abuse or violence, or be armed at the time with any dangerous weapon or weapons so as clearly to indicate an intention of violence"). LAWS OF THE TERRITORY OF THE UNITED STATES NORTH-WEST OF THE RIVER OHIO, FROM THE COMMENCEMENT OF THE GOVERNMENT TO THE 31ST OF DECEMBER, 1791 19–21 (Childs & Swaine 1792) (ch. 6, A Law Respecting Crimes and Punishments (passed Sept. 6, 1788)); *see also* STATUTES OF THE STATE OF VERMONT, PASSED BY THE LEGISLATURE IN FEBRUARY AND MARCH 1787 68–69 (George Hough & Alden Spooner 1787) (An Act for the Punishment of Divers Capital and Other Felonies § 4— Burglary and Robbery (passed Mar. 8, 1787)); ACTS AND LAWS, MADE AND PASSED BY THE GENERAL COURT OR ASSEMBLY OF THE GOVERNOR AND COMPANY OF THE STATE OF CONNECTICUT, HOLDEN AT NEW-HAVEN, ON THE SECOND THURSDAY OF OCTOBER, ANNO DOM. 1783 633 (Timothy Green 1783) (An Act for the Punishment of Burglary and Robbery (passed Oct. 9, 1783)). In each case, the armed offense was given a stiffer penalty than the unarmed offense. *Id.*

22

As one example, the Ohio Legislature provided that if one were convicted of robbery, he "shall be whipped, not exceeding thirty-nine stripes, and find sureties for good behaviour for a term not exceeding three years." *See* LAWS OF THE TERRITORY OF THE UNITED STATES NORTH-WEST OF THE RIVER OHIO, FROM THE COMMENCEMENT OF THE GOVERNMENT TO THE 31ST OF DECEMBER, 1791 19–21 (Childs & Swaine 1792) (ch. 6, A Law Respecting Crimes and Punishments (passed Sept. 6, 1788)). A conviction for armed robbery, on the other hand, required that the wrongdoer "forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol in the territory for a term not exceeding forty years." *Id.*

These aggravated crimes are the direct predecessors to the armed robbery laws that still exist today. *See* Texas Penal Code § 29.03 (1994); Miss. Code Ann. § 97-3-79 (2024); La. Rev. Stat. § 14:64.3 (2024). They are not, however, the clear lineal antecedents to § 924(c)(1)(A).

For one thing, the mechanics and scope of armed robbery statutes are fundamentally different from § 924(c). The armed robbery laws reflect an integrated drafting technique: the presence or use of a weapon

23

either produced a distinct offense under the substantive Code (*e.g.*, robbery "while armed") or elevated the grade of the underlying crime (first degree, second-degree, etc). These laws are structurally dissimilar to § 924(c) in two principal respects. First, they did not create an independent federal sentencing device that applies across the penal code to disparate and broadly defined predicates; rather, the increased punishment was *embedded* in the definition—and therefore the *mens rea* and proof structure—of the crime itself. Second, the historical aggravation was typically *unitary*; that is, the weaponized condition altered the offense's statutory gravity rather than generating an additional, separate punishment aimed squarely at the Second Amendment exercise. Because *Bruen* asks whether the modern law is "relevantly similar" in both *how* and *why* it burdens the right, these differences are fatal.

This Court should hesitate before concluding that the Founding-era armed robbery laws provide a sufficient historical analogue to 924(c). The fact that we can trace the unbroken lineage from those laws to present-day laws of the same character is a strong indication that § 924(c)(1)(A), with its different structure and aims, is doing something

24

else altogether.  Indeed, as demonstrated by the armed robbery example, the activity targeted by § 924(c) existed at the Founding, yet nothing like § 924(c)(1)(A) existed.  The Supreme Court's decisions in *Bruen* and *Rahimi* provide the rule in situations like this: "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.  This Court need only apply the rule in *Bruen* to resolve this case.

## CONCLUSION

In sum, there is no historic analogue to § 924(c)(1)(A).  None of the laws surveyed above were designed to achieve the same purpose or work the same way.  *Bruen* therefore requires that the judgement of the district court be reversed and that judgment be rendered in Mr. Madrid's favor.

**[SIGNATURE BLOCK ON NEXT PAGE]**

SUBMITTED BY:

*/s/ T. Peyton Smith*

T. Peyton Smith
Damonta D. Morgan
**FORMAN WATKINS & KRUTZ LLP**
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201
peyton.smith@formanwatkins.com
damonta.morgan@formanwatkins.com

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing pleading was filed electronically with the Clerk of Court using the Court's CM/ECF system and a copy sent to all counsel of record by electronic means on October 22, 2025.

/s/ *T. Peyton Smith*
T. Peyton Smith

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of <u>FED. R. APP. P. 32(a)(7)(B)</u> because, excluding the parts of the document exempted by <u>FED. R. APP. P. 32(f)</u> and <u>5th CIR. R. 32.1:</u> this document contains 4,941 words.

2. This document complies with the typeface requirements of <u>FED. R. APP. P. 32(a)(5)</u>, and <u>5th CIR. R. 32.1</u> and the type-style requirements of <u>FED. R. APP. P. 32(a)(6)</u> because: this document has been prepared in a proportionally spaced typeface using Microsoft Word Processor in 12-point Century Schoolbook font.